1

2

3

4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    OKHTAY AZARMANESH,                        Case No.  23-cv-05210-LJC

8                  Plaintiff,

9          v.                                  **ORDER REGARDING MOTIONS FOR
                                               SUMMARY JUDGMENT**
10   PAMELA BONDI, et al.,                      Re: Dkt. Nos. 33, 35

11                 Defendants.

## I.    INTRODUCTION

Plaintiff Okhtay Azarmanesh, a lawful permanent resident (LPR), brings claims related to
the denial of his naturalization application to become a U.S. citizen.  Defendants are several U.S.
government officials with responsibilities related to immigration and naturalization, some of
whom are automatically substituted under Rule 25(d) of the Federal Rules of Civil Procedure.[1]

On two occasions Azarmanesh has applied to adjust his status to legal permanent resident,
and both applications have been granted.  After the first LPR application was granted in 2017,
Azarmanesh applied for naturalization as a citizen in 2021.  Defendants denied that naturalization
application on the basis that the first LPR application was granted in error, and Azarmanesh is
therefore ineligible for citizenship, though he may eventually become eligible for citizenship
based on the subsequent approval of his second application for adjustment of status, which was
granted in 2023.  Among the eligibility requirements that Azarmanesh needed to satisfy for
naturalization, Defendants contend he was required to show that he had been a *lawfully* admitted

---

[1] Of particular note for the purpose of the case caption, Attorney General Pamela Bondi is
automatically substituted for former Attorney General Merrick Garland.  The other substituted
defendants are Kristi Noem (for Alejandro Mayorkas) and Kika Scott (for Ur Mendoza Jaddou).
As far as the Court is aware, Michael Valverde and James Wyrough remain in their roles and
therefore remain as defendants.  If the Court is mistaken as to any current officeholders, this
decision applies fully to their successors pursuant to Rule 25(d).

United States District Court
Northern District of California

permanent resident for at least five years immediately preceding the filing of his N-400 naturalization application. 8 U.S.C. § 1427(a). Through his First Amended Complaint, Azarmanesh seeks to set aside Defendants' denial of his naturalization application, to have this Court conduct *de novo* review of the application, and to gain United States citizenship based on the first grant of legal permanent residence, which has a 2016 effective date.

To resolve the claims, the parties filed cross-motions for summary judgment (Defendants also move in the alternative for judgment on the pleadings), and the Court held a hearing. The parties filed supplemental briefing and evidence after the hearing, as well as a notice of supplemental authority. The competing motions turn primarily on the question of whether 8 U.S.C. § 1159(b)(3) requires a derivative spouse of an asylee to remain married to the asylee through the date when the adjustment of status application is adjudicated to attain a lawful grant of legal permanent residence. The Court holds that it does not.

For the reasons discussed below, Azarmanesh's Motion is GRANTED, and Defendants' Motion is DENIED.[2]

## II.    BACKGROUND

### A.    The Relevant Statute

The Court begins with 8 U.S.C. § 1159, the relevant statute that is at the center of the parties' dispute regarding Azarmanesh's eligibility for adjustment of status. In particular, the parties dispute the meaning of subsection (b)(3). The parties address that provision in the context of the broader subsection (b), which reads as follows:

> **(b) Requirements for adjustment**
> The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—
>
> (1) applies for such adjustment,
>
> (2) has been physically present in the United States for at least one year after being granted asylum,

---

[2] The parties have consented the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636.

1

*(3) continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,*

2

3

*(4) is not firmly resettled in any foreign country, and*

4

*(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of examination for adjustment of such alien.*

5

6

*Upon approval of an application under this subsection, the Secretary of Homeland Security or the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.*

7

8

8 U.S.C. § 1159(b) (emphasis added).

9

As far as this Court is aware, only three other courts have considered the issues of whether

10

§ 1159(b)(3) requires a derivative asylee's marriage to continue through the date of adjudication of

11

an application to adjust status: the Western District of Wisconsin's decision in *Dormor v. United*

12

*States*, cited extensively in the parties' briefing here; the District of Maryland's case *Soumah v.*

13

*Collett*, where the first of two decisions was identified in Plaintiffs' Notice of Supplemental

14

Authority; and a very recent decision by the Eastern District of Virginia in *Zalmai v. Josephs-*

15

*Conway*.  All of those courts held that a derivative asylee applying for adjustment need not remain

16

married to the principal asylee at the time of adjudication.  *See Dorbor v. United States*, 379 F.

17

Supp. 3d 765 (W.D. Wis. 2019); *Soumah v. Collett* (*Soumah I*), 738 F. Supp. 3d 631 (D. Md.

18

2024) (denying the Government's motion to dismiss); *Soumah v. Collett* (*Soumah II*), No. 23-

19

2473-TDC, 2025 WL 638472 (D. Md. Feb. 27, 2025) (granting the plaintiff's motion for summary

20

judgment); *Zalmai v. Josephs-Conway*, No. 1:24-cv-497 (PTG/WBP), 2025 WL 938619 (E.D. Va.

21

Mar. 27, 2025).

22

**B.    Factual and Procedural History**

23

Although the facts of this case are presented in a somewhat unusual manner, with

24

Azarmanesh offering no evidence to support his Motion for Summary Judgment, the parties agree

25

that the material facts are not in dispute.  *See* ECF No. 35 at 10.  Defendants further agreed on the

26

record at the hearing that all exhibits attached to Azarmanesh's First Amended Complaint are

27

authentic.

28

Azarmanesh married Seyedeh Shirin Moadel Shahidi in 2012.  1st Am. Compl. (FAC, ECF

United States District Court
Northern District of California

United States District Court
Northern District of California

No. 15) ¶ 22;[3] ECF No. 35-2 at 4.  Moadel Shahidi applied for asylum in the United States and listed Azarmanesh as a derivative beneficiary on her application.  U.S. Citizenship and Immigration Services (USCIS) granted Azarmanesh and Moadel Shahidi asylum on November 10, 2015 based on Moadel Shahidi's application.  FAC ¶ 25 & Ex. A; ECF No. 35-1, ¶ 3.

On December 15, 2016, Azarmanesh filed a Form I-485 application to adjust status to become an LPR as the spouse of an asylee.  FAC ¶ 26; ECF No. 35-1, ¶ 6.  On May 24, 2017, while his application to adjust status was pending, a divorce judgment terminated Azarmanesh and Moadel Shahidi's marriage.  FAC ¶ 27; ECF No. 35-2 at 2.[4]  Azarmanesh's adjustment application was granted without an interview on August 25, 2017, and he received a green card indicating that he was an LPR as of August 25, 2016.  FAC ¶¶ 28–29 & n.1; ECF No. 35-1, ¶ 8; *see* 8 C.F.R. § 209.2(f) ("If the application is approved, USCIS will record the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application . . . .").

On May 27, 2021, Azarmanesh applied for naturalization to become a citizen.  FAC ¶ 30.  He appeared for an interview to determine eligibility on May 21, 2022.  ECF No. 15-3.  USCIS denied that application on July 14, 2022, solely on the basis that Azarmanesh had not lawfully obtained LPR status because he was not married to an asylee at the time that his adjustment application was granted.  FAC ¶ 31 & Ex. C; ECF No. 35-1, ¶ 11.  The denial letter informed him that he could file a Form N-336 request for a hearing within thirty-three days, but he did not do so.  FAC Ex. C at 2; ECF No. 35-1, ¶ 11.

In the meantime, Azarmanesh had married Mahtab Ghazizadeh, a U.S. citizen, on March 3, 2022.  FAC ¶ 32; ECF No. 35-1, ¶ 10; ECF No. 35-2.  On August 8, 2022, Ghazizadeh filed a petition to classify Azarmanesh as the spouse of a U.S. citizen, and Azarmanesh filed a new Form

---

[3] Because a plaintiff's mere allegations are not taken as true in the context of a motion for summary judgment, this Order cites only those allegations that Defendants admit in their Answer (ECF No. 28).  Other allegations—for example, the allegation that Azarmanesh lawfully entered the United States in 2006 and again in 2009 to complete a Ph.D. in electrical engineering, which Defendants deny for lack of knowledge—are not relevant to the outcome of the present motion.
[4] Citations in this Order to documents filed in the docket of this case refer to page numbers as assigned by the Court's ECF filing system unless otherwise noted.

I-485 application to adjust status to be an LPR based on his marriage to Ghazizadeh.  FAC ¶ 32 & Ex. C; ECF No. 35-1, ¶ 12.

USCIS denied Azarmanesh's second application to adjust status on February 15, 2023 because he had "already been granted LPR status on August 25, 2017."  FAC ¶ 33 & Ex. E; *see* ECF No. 35-1, ¶ 13.  Defendants now assert that although Azarmanesh's LPR status was not obtained *lawfully* as required for naturalization, he nevertheless *had* LPR status that had not been "abandoned, rescinded, or terminated," and thus could not adjust status to obtain such status again under an unspecified then-existing policy.  *See* ECF No. 35 at 16; ECF No. 35-1, ¶ 13.  Contrary to that assertion, Azarmanesh submits a 2013 USCIS legal memorandum concluding that applicants who already have LPR status are allowed to seek adjustment of status again, ECF No. 37-2, and acknowledging that they might wish to do so if their original status had been granted in error, *id.* at 3.

Azarmanesh apparently recognized that USCIS's 2023 denial of his second application to adjust status based on the grounds that he already had LPR status contradicted the reasoning for the denial of his first naturalization application, and filed an untimely Form N-336 request for a hearing on his naturalization decision.  ECF No. 35-1, ¶ 15.  USCIS accepted the late request for a hearing on March 17, 2023, but never scheduled a hearing on that request.  FAC ¶¶ 34, 37 & Ex. F.  Azarmanesh filed his original Complaint in this action on October 12, 2023, seeking a hearing under 8 C.F.R. § 336.2, which requires USCIS to schedule a hearing within 180 days of a timely N-336 request.  ECF No. 1.

On November 8,[5] 2023, USCIS reopened sua sponte Azarmanesh's second I-485 application to adjust status and granted that application, issuing Azarmanesh a second green card showing that he was an LPR as of November 6, 2023.  FAC ¶ 39 & Ex. G; ECF No. 35-1, ¶ 16.  Later that month, USCIS rejected Azarmanesh's N-336 request for a hearing as untimely filed.

---

[5] USCIS Acting Section Chief Aleksandra Shpolyanskaya states that the reopening occurred on November 6th, ECF No. 35-1, ¶ 16, which corresponds to the date on the second green card, but Defendants admit in their Answer the allegation that they reopened the application on November 8th, Answer ¶ 39, thus establishing that fact for the purpose of this case.  The distinction is not material to the outcome of the present Motions.

1    FAC Ex. I; ECF No. 35-1, ¶ 17.  Azarmanesh alleges that USCIS also indicated through a notice

2    on its website that the request was denied for failure to pay the correct fee, FAC ¶ 44 & Ex. H, but

3    Defendants denied that allegation, Answer ¶ 44.  That dispute is not relevant to the outcome of the

4    present Motions.

5        Azarmanesh filed his operative First Amended Complaint challenging the denial of his

6    naturalization application on December 18, 2023.  He brings his first claim under the Immigration

7    and Nationality Act (INA) and the Administrative Procedures Act (APA), asserting that the INA

8    only requires that he was married to an asylee at the time he applied to adjust status to be an LPR

9    not at the time that application was adjudicated, that USCIS failed to adjudicate his application for

10   adjustment of status in a reasonable amount of time, and that USCIS's "repeatedly reversed . . .

11   positions" have been arbitrary and capricious.  FAC ¶¶ 48–58.  Azarmanesh's second claim,

12   brought under the APA, asserts that Defendants violated his Fifth Amendment right to due process

13   by applying a fundamentally unfair date-of-adjudication approach to his marriage and adjustment

14   application.  FAC ¶¶ 59–62.  He asks the Court to approve his naturalization application and order

15   Defendants to produce a Certificate of Naturalization.  FAC at 10 (Prayer for Relief).

16       After the parties stipulated multiple times to extend time for Defendants to respond to the

17   First Amended Complaint, Defendants brought a unilateral Administrative Motion for a further

18   extension on March 25, 2024 (then the deadline to respond), which Azarmanesh opposed and the

19   Court granted in part.  ECF Nos. 25–27.  Defendants answered, and the parties brought cross-

20   motions to resolve the case, with Azarmanesh's Motion (ECF No. 33) captioned as a Motion for

21   Summary Judgment (but lacking any supporting evidence), and Defendants' Motion (ECF No. 35)

22   captioned as either a Motion for Judgment on the Pleadings or a Cross-Motion for Summary

23   Judgment, supported by the declaration of USCIS Acting Section Chief Aleksandra

24   Shpolyanskaya (ECF No. 35-1).

25       **C.    The Parties' Arguments**

26           **1.    Azarmanesh's Motion**

27       Azarmanesh argues that this case is properly before the Court because he exhausted

28   administrative remedies for his naturalization application by filing a Form N-336 request for a

6

1    hearing, which USCIS initially accepted. ECF No. 33 at 10–11. He contends that the denial of his

2    second Form I-485 application to adjust status made clear that he received LPR status effective in

3    2016, contradicting the stated reason for denial of his naturalization application and establishing

4    that he was eligible for naturalization. *Id.* at 12–13.

5        Azarmanesh also contends that USCIS was correct to grant him LPR status on his first

6    application, because his marriage to an asylee at the time of his application satisfied the criteria for

7    eligibility, and—in his view—§ 1159(b)(3) does not require the marriage to continue through the

8    date of adjudication. *Id.* at 14. Azarmanesh asks this Court to follow the Western District of

9    Wisconsin's decision in *Dorbor*, holding that an applicant seeking to adjust status under § 1159(b)

10   must be married to the principal asylee only at the time an application is submitted, and that

11   divorce while the application is pending does not require either denial of LPR status or denial of

12   naturalization if LPR status was granted after divorce. *Id.* at 21–22 (citing *Dorbor*, 379 F. Supp.

13   3d 765).[6] He also cites circuit decisions holding that other immigration statutes based on familial

14   status are evaluated at the time of an application. *Id.* at 19–21 (citing *Choin v. Mukasey*, 537 F.3d

15   1116, 1118 (9th Cir. 2008); *Carpio v. Holder*, 592 F.3d 1091, 1092 (10th Cir. 2010)).

16   Azarmanesh contends that "there is nothing in 8 U.S.C. § 1159 that suggests" a different approach

17   is warranted here, and he argues that it would be absurd and unfair to condition a status adjustment

18   on the timing of USCIS's decision, which is outside of an applicant's control. *Id.* at 22–24.

19       Finally, Azarmanesh contends that USCIS's conflicting positions and unreasonable delay

20   violated the Administrative Procedures Act. *Id.* at 24–25.

21       **2.    Defendants' Motion**

22       Defendants move for judgment on the pleadings under Rule 12(c) of the Federal Rules of

23   Civil Procedure, or in the alternative, for summary judgment under Rule 56. *See generally* ECF

24   No. 35. Because Defendants submit evidence with their Motion, *see* ECF No. 35-1, the Court

---

[6] In response to Azarmanesh's reliance on *Dorbor*, Defendants mischaracterize that case as "unpublished," ECF No. 38 at 2, despite using the published Federal Supplement citation for it in the same brief, *id.* at 5. The distinction is not important, however, because the question of whether a district court decision is published generally has no significance in evaluating its persuasive value. *See Advsr, LLC v. Magisto Ltd.*, No. 19-cv-02670-JCS, 2020 WL 978610, at *8 n.2 (N.D. Cal. Feb. 28, 2020).

United States District Court
Northern District of California

construes it as a motion for summary judgment, without reaching the question of whether judicial notice might be appropriate if Defendants had moved only under Rule 12(c). Defendants' Motion also serves as their opposition to Azarmanesh's Motion.

Defendants argue that although Azarmanesh was granted LPR status in 2017, such status must have been *lawfully* granted, and it was not lawfully granted because he was no longer married to the principal asylee at that time. ECF No. 35 at 12, 19–20 (citing, *e.g.*, 8 U.S.C. § 1429; *Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010)). In Defendants' view, the text and legislative history of § 1159 show that its conditions apply at the time of adjudication, which is consistent with USCIS's interpretation of that law in its policy manual. *Id.* at 21–24.

Defendants acknowledge that *Dorbor* appeared (at the time of briefing) to be the only decision addressing the specific question at issue here, but they argue that it is not persuasive and this Court should decline to follow it. *Id.* at 25–26. As for Azarmanesh's APA claims, Defendants argue that the Court lacks jurisdiction to review a denial of naturalization through the lens of the APA because 8 U.S.C. § 1421(c) provides a specific and exclusive procedure for such review. *Id.* at 35.

### 3.    Azarmanesh's Opposition Brief

Azarmanesh argues that he now meets the naturalization requirement of having been lawfully admitted for permanent residence because USCIS granted his second I-485 application to adjust status based on his current marriage to a U.S. citizen. ECF No. 37 at 6–7. He suggests (without explicitly arguing) that the Court could grant summary judgment in his favor on that basis even if the Court disagrees with his interpretation of § 1159(b)(3) and finds that the initial grant of LPR status was erroneous. *Id.* He also argues that the cases rejecting naturalization where LPR status was erroneously granted are distinguishable because the applicants in those cases were *never* eligible for adjustment of status, and many of them involved fraud or misrepresentation. *Id.* at 12–14.

Azarmanesh contends that Defendants' interpretation of the statute would render § 1159(b)(2)—requiring presence in the United States for one year—superfluous, because § 1159(b)(3)'s requirement that an applicant remain a refugee for however long it takes to

adjudicate the application would also require that the applicant not return to their home country. *Id.* at 8.  He argues that subsection (b)(5)'s specific condition of admissibility "at the time of examination for adjustment" suggests that the same temporal condition should not attach to subsection (b)(3), which does not include that language.  *Id.* at 8–9.  Azarmanesh also argues that legislative history indicates Congress intended to condition LPR status on maintaining refugee status for one year, not indefinitely through the date of adjudication.  *Id.* at 9–10.

Azarmanesh argues that caselaw addressing other immigration statutes and USCIS's practices in other contexts favor a date-of-application approach and recognize that applicants should not be punished for delays in USCIS processing their applications.  *Id.* at 10–12.  He further argues that principles of equitable estoppel support his position because USCIS gave shifting and contradictory reasons for its treatment of his various applications, but cites no legal authority to support that argument.  *Id.* at 14–16.

Azarmanesh does not appear to dispute that § 1421(c) is the exclusive means to review a denial of naturalization and the APA does not allow for such review.  *Id.* at 16.  Instead, he argues that the APA allows the Court to review USCIS's delay in granting his latest I-485 application to adjust status, and the Court should "order[] USCIS to issue a new LPR card backdated to February 15, 2023, the date USCIS denied his second LPR adjustment."  *Id.*

### 4.    Defendants' Reply

Defendants contend that Azarmanesh must have been *lawfully* granted LPR status and have held that status for at least five years to naturalize, so neither his first erroneous LPR status nor his more recent 2023 status establishes eligibility.  ECF No. 38 at 2–4.  Defendants argue that although many cases discussing the requirement that LPR status must have been correctly granted involved fraud, they did not turn on that issue.  *Id.* at 3–4.  According to Defendants, neither the lack of any fraud by Azarmanesh nor the fact that his first LPR status was never rescinded excuses the fact that it was not lawfully granted.  *Id.*

Defendants reiterate their view that the plain language of § 1159(b)(3) requires marriage to continue through the date of adjudication.  ECF No. 38 at 4–5.  They argue that § 1159(b)(2) only requires that an applicant has remained in the United States for one year as of the date of

adjudication, not the date of an application, contrary to Azarmanesh's and *Dorbor*'s interpretation of that subsection. *Id.* at 5–6. Defendants contend that the reference to the time of examination in subsection (b)(5) addresses potential waivers of inadmissibility granted after an application is filed but before it is adjudicated. *Id.* at 6. Defendants argue that applying Azarmanesh's time-of-application test to all subsections of § 1159(b) would have absurd results. *Id.* at 7.

Defendants contend that courts lack equitable authority to grant naturalization except under the conditions where it is specifically allowed by law, that the APA does not provide for review of naturalization decisions, and that this case concerns the denial of Azarmanesh's naturalization application, not his 2023 application to adjust status. *Id.* at 7–8.

### 5.    Supplemental Briefing

At the Court's request, Defendants filed a supplemental brief after the hearing arguing that Azarmanesh had a duty to inform USCIS of changed circumstances while his application was pending, ECF No. 42, and Azarmanesh filed a response arguing to the contrary, ECF No. 43. Azarmanesh later filed a Notice of Supplemental Authority, citing the District of Maryland's first decision in *Soumah* holding that a derivative asylee married to the principal asylee as of the date of an application for adjustment of status need not remain married through the date of adjudication. ECF No. 44 (citing *Soumah I*, 738 F. Supp. 3d 631).

## III.    LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

District courts may review the denial of a naturalization application de novo.  8 U.S.C. § 1421(c).[7]  "[T]he burden is on the alien applicant to show his eligibility for citizenship in every respect," and as a general rule, "doubts should be resolved in favor of the United States and against the claimant."  *Berenyi v. Dist. Dir., I.N.S.*, 385 U.S. 630, 637 (1967); *see also, e.g.*, *Orellana v. McAleenan*, No. 19-cv-05759-DMR, 2020 WL 1904588, at *2 (N.D. Cal. Apr. 16, 2020) (quoting *Berenyi*), *aff'd sub nom. Orellana v. Mayorkas*, 6 F.4th 1034 (9th Cir. 2021). Because the "Constitution confers upon Congress exclusive authority to establish rules of naturalization," courts are bound by the terms Congress has set, and cannot confer citizenship "'by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means . . . in violation of these limitations.'"  *Mustanich v. Mukasey*, 518 F.3d 1084, 1087–88 (9th Cir. 2008) (quoting *I.N.S. v. Pangilinan*, 486 U.S. 875, 885 (1988)).

## IV.    ANALYSIS

### A.    Threshold Issues and Arguments Not Reached

Subject to certain exceptions not at issue here, "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of" Title 8, Chapter 12, of the U.S. Code.  8 U.S.C. § 1429.  Section 1159 falls within that chapter.  District courts have held that LPR status does not meet that standard if it was not "lawfully" granted, or in other words, if it was erroneously granted to someone who did not meet the criteria for it.  *E.g.*, *Ratcher v. Sec'y of Dep't of Homeland Sec.*, No. 5:19-cv-01945-SB-SP, 2021 WL 8314612, at *3 (C.D. Cal. Feb. 1, 2021).  This Court is aware of no decision to the contrary, and assumes for the sake of argument that principle is correct.  Because the Court now determines that Azarmanesh's first LPR status *was* lawfully granted, the Court need not resolve the question of whether that is a precondition to naturalization.

Azarmanesh also suggests, without specifically arguing the point, that Defendants cannot

---

[7] Although § 1421(c) contemplates review after an administrative *hearing* on a naturalization petition, Defendants have not argued that Azarmanesh's untimely hearing request or the lack of such a hearing on his application precludes this Court's review.

United States District Court
Northern District of California

rely on any defect in his first grant of LPR status when Defendants never took steps to rescind that status. *See* ECF No. 27 at 6–7 (responding to Defendants' argument that rescission is unnecessary, and distinguishing cases that Defendants cited). Again, because the Court determines below that USCIS properly granted Azarmanesh LPR status in 2017 (with an effective date in 2016), the Court need not decide whether Defendants might be required to pursue rescission under 8 U.S.C. § 1256(a) before asserting that such status was not lawfully granted.

Azarmanesh devotes multiple pages of his opposition brief to an argument that "the principle of equitable estoppel favors [him] because USCIS's behavior towards him has been egregious and unfair." ECF No. 37 at 14–16 (heading capitalization altered). He cites no legal authority in support of that argument. "Once it has been determined that a person does not qualify for citizenship, the district court has no discretion to ignore the defect and grant citizenship." *Pangilinan*, 486 U.S. at 884. "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.* at 885. If Azarmanesh was not eligible for naturalization by statute, "[e]stoppel in these circumstances would amount to precisely the type of equity-based departure from the requirements of the immigration statutes that *Pangilinan* prohibits." *Mustanich*, 518 F.3d at 1088. This Order therefore does not rely on that doctrine.

Courts have also held that the APA does not provide a separate path to review a denial of naturalization when Congress has provided for such review under 8 U.S.C. § 1421(c). *E.g.*, *Ngamfon v. U.S. Dep't of Homeland Sec.*, 349 F. Supp. 3d 975, 983 n.4 (C.D. Cal. 2018). The Court need not reach that question here.

Reviewing the denial of Azarmanesh's naturalization application de novo pursuant to 8 U.S.C. § 1421(c), the Court proceeds to address the merits of whether Azarmanesh was eligible for LPR status when USCIS granted his application for it in 2017, and thus eligible for naturalization five years after the effective date of that first LPR status.

### B.     Interpreting 8 U.S.C. § 1159(b)(3)

The primary dispute in this case is whether 8 U.S.C. § 1159(b)(3) requires that an applicant who is a spouse of an asylee remain married to the asylee through the date the application for

adjustment of status is decided, or if it is enough for an applicant to have been married to the asylee at the time that the application is submitted. For the reasons discussed below, this Court agrees with the consensus of other district courts that have addressed the issue and held that marriage is only required at the time of application.

When engaging in questions of statutory interpretation, courts "start, of course, with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (cleaned up). The analysis "ends there . . . if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). On the other hand, if the text is ambiguous, courts may consider interpretations rendered by the agencies responsible for implementing the relevant statutes, among other relevant considerations. The parties dispute whether Section 1159(b)(3) is unambiguous, and the Court begins with that issue.

### 1. Ambiguity

The statutory text provides in relevant part that the Government "may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who . . . continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee." 8 U.S.C. § 1159(b)(3). As Azarmanesh acknowledges, "[t]he word 'continues' denotes the passage of time and that the derivative asylee must have a relationship with the principal at an earlier point in time and a later point in time." ECF No. 33 at 15. Yet, nothing in this text of this subsection states precisely how long the marital relationship must continue, and the duration is not obvious from reading the other subsections within 8 U.S.C. § 1159(b). To the contrary, subsection (b)(5) of the statute specifically provides that a different criterion, admissibility as an immigrant, is evaluated "at the time of examination for adjustment," which the parties appear to agree is equivalent to the time of adjustment.

Other courts considering this question have held that the "time of examination" language in subsection (b)(5) and the lack of such language in subsection (b)(3), among other textual clues, indicates that continued marriage under subsection (b)(3) is *not* evaluated at the time of adjustment. *Dorbor*, 379 F. Supp. 3d at 770; *Soumah I*, 738 F. Supp. 3d at 639. Defendants

United States District Court
Northern District of California

1  concede that "that is one plausible reading of the statute," ECF No. 35 at 26, thus effectively

2  acknowledging that the statute is ambiguous.

3          While Defendants currently construe subsection (b)(2) as requiring one year of continuous

4  present in the United States only as of the date of adjudication, the USCIS policy manual

5  acknowledges that "USCIS' practice and policy has varied with regard to whether the 1 year of

6  physical presence was required *at the time of filing* or at the time of adjudication of the

7  application," further reinforcing that the temporal focus of these eligibility requirements is

8  ambiguous.  USCIS Policy Manual, vol. 7, pt. M, ch. 2, § A n.2, https://www.uscis.gov/policy-

9  manual/volume-7-part-m-chapter-2 [https://perma.cc/86Z3-TDQJ] (emphasis added).

10         That three other federal courts have now disagreed with USCIS's interpretation is itself

11 another indication that the statute does not unambiguously compel USCIS's preferred reading of

12 it.  And as noted by the Eastern District of Virginia in *Zalmai*, the fact that USCIS has sometimes

13 "granted [derivative asylees] LPR status, with clear knowledge of their divorce, [as] in *Soumah*

14 and *Dorbor*," also tends to suggest ambiguity.  *Zalmai*, 2025 WL 938619, at *5.  If the statute

15 unambiguously required continued marriage at the time of adjudication, "surely USCIS would not

16 have granted" those applications.  *Id.*

17         The Court therefore concludes that that § 1159(b)(3), including the meaning of the word

18 "continues" in that context, is ambiguous as to whether a derivative asylee must still be married to

19 a principal asylee at the time of adjudication.

20                            **2.    Agency Interpretations**

21         Courts determining the meaning of ambiguous statutory provisions may "seek aid from the

22 interpretations of those responsible for implementing particular statutes," as "[s]uch interpretations

23 'constitute a body of experience and informed judgment to which courts and litigants may

24 properly resort for guidance.'"  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)

25 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).[8]

26

27 [8] Defendants' briefing cited the doctrine of *Chevron, U.S.A., Inc. v. Natural Resources Defense
   Council, Inc.*, 467 U.S. 837 (1984), and at the time they filed their brief, *Chevron* remained good
28 law.  Though *Loper* has since overruled *Chevron*, the Court still addresses Defendants' argument
   as an agency interpretation as may still be entitled to *Skidmore* deference.  *See Loper*, 603 U.S. at

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Given that the meaning of § 1159(b)(3) is unclear, the Court considers whether it must

2  afford deference to USCIS's reading of the provision.  At the hearing, Defendants clarified that

3  they seek deference only towards, if anything, the implementing regulation for § 1159(b)(3).  That

4  regulation largely repeats the language of the statute, except for adding the word "is" in relation to

5  spouses and children, which sheds little light on this inquiry.  8 C.F.R. § 209.2(a)(1)(iii)

6  ("Continues to be a refugee within the meaning of section 101(a)(42) of the Act, or *is* the spouse

7  or child of a refugee" (emphasis added)).  As defense counsel acknowledged at the hearing, the

8  regulation is virtually identical to the statute, "almost exactly word for word."  Nothing on the face

9  of the regulation purports to interpret the statute in the manner Defendants prefer, as requiring

10  marriage at the time of adjudication rather than merely at the time the application is submitted.

11  The Federal Register notice accompanying the original version of § 209.2 (which does not differ

12  materially from the current version) also does not address this issue.  Aliens and Nationality;

13  Refugee and Asylum Procedures, 45 Fed. Reg. 37,392 (June 2, 1980).

14    In an abundance of caution, the Court also considers whether USCIS's policy manual's

15  discussion of the required continuation of a derivative asylee's marriage warrants deference,

16  although Defendants disclaimed any intent to invoke deference to that document at the hearing.

17  "[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all

18  of which lack the force of law—[did] not warrant *Chevron*-style deference," *Christensen v. Harris*

19  *County*, 529 U.S. 576, 587 (2000), even before the recent demise of the *Chevron* doctrine.

20  "Instead, [such] interpretations . . . are 'entitled to respect' under . . . *Skidmore v. Swift & Co.*, 323

21  U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade'

22  . . . ." *Id.*  As other courts have held, USCIS's policy manual is therefore entitled to respect only if

23  warranted under the *Skidmore* doctrine.  *See, e.g.*, *Rios v. U.S. Citizenship & Immigr. Servs.*, No.

24  CV 20-2370-CBM-(PVCx), 2021 WL 4860686, at *5 (C.D. Cal. Feb. 26, 2021).

25    As Azarmanesh acknowledges in his Motion, the policy manual states that an applicant for

26  adjustment must still be married to any asylee spouse at the time of adjudication.  The complete

27

28  _____
402, 412.

relevant discussion of this issue in the policy manual reads as follows:

> C. Derivative Asylee Continues to be the Spouse or Child of the Principal Asylee
>
> A derivative asylee must continue to meet the definition of a spouse or child of a refugee both at the time of filing and final adjudication of the adjustment application. A derivative asylee spouse fails to meet this eligibility requirement if the marital relationship has ended. . . .
>
> A derivative asylee who fails to meet this requirement does not lose his or her asylum status when the relationship to the principal asylee ends or when the principal asylee naturalizes. A derivative asylee only loses the ability to adjust status as a derivative asylee, but may adjust status under another category if he or she can establish eligibility.
>
> . . .
>
> *Divorced Spouse*
>
> A spouse who is divorced from the principal asylee is no longer a spouse of the principal and is no longer eligible to adjust status as a derivative asylee.

USCIS Policy Manual, vol. 7, pt. M, ch. 2, § C, https://www.uscis.gov/policy-manual/volume-7-part-m-chapter-2 [https://perma.cc/86Z3-TDQJ].

Opinions that are "conclusory and lack[] any meaningful analysis" warrant "no deference" under the *Skidmore* doctrine. *Shin v. Holder*, 607 F.3d 1213, 1219 (9th Cir. 2010). This section of the policy manual does not include any explanation or support for the particular durational requirement that it imposes. In that regard, it does not evidence a thorough consideration by USCIS of the matter, let alone a valid judgment as to what Congress intended. *See id.* ("[T]he weight [to be afforded to an interpretation] depends on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, [among other] factors which give it power to persuade . . . .'" (quoting *Skidmore*, 323 U.S. at 140)).

Even if the policy manual were construed as an interpretation of the implementing regulation, rather than of the statute itself, that would not change the outcome. Agency interpretations of their own regulations are sometimes entitled to deference under the doctrine of *Auer v. Robbins*, 519 U.S. 452 (1997), and related cases. *See generally Kisor v. Wilkie*, 588 U.S. 558, 568–80 (2019) (discussing the contours of *Auer* deference). Here, though, 8 C.F.R. § 209.2(a)(1)(iii) uses substantially the same language as 8 U.S.C. § 1159(b)(3), with no clearer

16

1    indication that it is intended to require marriage at the time of adjudication.  "An agency does not

2    acquire special authority to interpret its own words when, instead of using its expertise and

3    experience to formulate a regulation, it has elected merely to paraphrase the statutory language."

4    *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).  Defendants do not argue that *Auer* deference

5    applies to this provision of the policy manual, and the Court concludes that it does not.

6           The Court takes judicial notice of the policy manual (as a matter of public record) for the

7    purpose of showing how USCIS understands and applies § 1159(b)(3) but affords it no deference

8    in the Court's interpretation of that statute.

9                  **3.    Section 1159(b) Does Not Require that Marriage Continues Through**
                        **Adjudication**

10

11          Having found that text of § 1159(b)(3) is ambiguous, and USCIS's accompanying

12   regulation and policy statement are not entitled to deference, the Court must endeavor to interpret

13   the provision.  "In weighing the strength of the parties' competing interpretation [of a statute], we

14   consider [its] meaning . . . in light of the purpose of the statute and its context in the statutory

15   scheme."  *Choin v. Mukasey*, 537 F.3d 1116, 1120 (9th Cir. 2008).  "Interpretation of a word or

16   phrase depends upon reading the whole statutory text, considering the purpose and context of the

17   statute, and consulting any precedents or authorities that inform the analysis."  *Dolan v. U.S.*

18   *Postal Serv.*, 546 U.S. 481, 486 (2006).  The language, structure, purpose, and application of a

19   statute guide the courts' interpretation of provisions in a regime for adjustment of status.  *See*

20   *Freeman v. Gonzales*, 444 F.3d 1031, 1040 (9th Cir. 2006).

21                  **a.    Refugees, Asylees, and the Structure of § 1159 Generally**

22          To understand the context in which Section 1159(b) operates, the Court briefly reviews the

23   statutory scheme by which refugees, asylees,[9] and their derivative spouses and children may seek

24   _____

25   [9] To clarify somewhat confusing terminology, asylees (who obtain such status after arriving in the
     United States) are distinct from people *admitted* as refugees (who obtain such status before

26   arriving in the United States), but a core requirement for asylum is that a principal applicant must
     meet the statutory definition of a "refugee," most notably a well-founded fear of persecution based

27   on any of several enumerated grounds.  *See* 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A), 1159(b)(3).
     Strictly speaking, the INA treats asylees as a subset of refugees.  *See id.* § 1158(b)(1)(A)

28   (providing for granting asylum if "such alien is a refugee").  References in this Order to
     "refugees" as a distinct category from "asylees" should be understood to mean refugees *admitted*

to adjust their status to legal permanent resident.

> The statutory definition of the term "refugee" contained in § 101(a)(42) applies to two asylum provisions within the Immigration and Nationality Act.  Section 207 [of the INA], 8 U.S.C. § 1157, governs the admission of refugees who seek admission from foreign countries. Section 208, 8 U.S.C. § 1158, sets out the process by which refugees currently in the United States may be granted asylum. Prior to the 1980 amendments there was no statutory basis for granting asylum to aliens who applied from within the United States.

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987) (footnotes omitted).  Accordingly, these two categories of individuals who receive relief under the provisions of sections 207 and 208 of the INA, are individuals admitted as refugees or granted asylee status, respectively.  *See* 8 U.S.C. §§ 1101(42), 1158(b)(1)(A).  "[O]ne of the primary purposes of the Refugee Act of 1980 (of which § 1159 is a part) [was] to put refugees on the same footing as other immigrants," by "'repeal[ing] the [previous] immigration law's discriminatory treatment of refugees' and 'accord[ing] refugee admissions the same immigration status given all other immigrants.'" *Dorbor*, 379 F. Supp. 3d at 770 (quoting S. Rep. 96-256, 1, 1980 U.S.C.C.A.N. 141, 142).

Section 1159, enacted by section 209 of the INA, establishes a process for refugees and asylees to seek legal permanent residency after one year of physical presence in the United States. Refugee Act of 1980, Pub. L. No. 96-212, § 209, 94 Stat. 102.[10]  Congress's objective in adopting the Refugee Act of 1980 was to "provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."  Pub. L. No. 96-212, § 101.

---

to the United States as such under 8 U.S.C. § 1157, rather than individuals granted asylum to *remain* in the United States based on their refugee status under 8 U.S.C. § 1158.

[10] Chapter 1 of the USCIS policy manual describes the following background: "Before the Refugee Act of 1980, refugee admission policy was reactive and piecemeal as it grew in response to humanitarian crises and ethnic conflicts. The result was an assortment of laws and regulations that classified persons as refugees, conditional entrants, parolees, pre-parolees, escapees, evacuees, or asylum grantees. In many cases, the long-term resolution of these classifications was unclear."  Volume 7, Part L, Chapter 1, https://www.uscis.gov/policy-manual/volume-7-part-l-chapter-1 [https://perma.cc/JL2X-EDYT].  In addition to establishing "a uniform basis for permanent resettlement" for refugees, the Refugee Act reduced the time for a refugee to apply for adjustment from the previously required two-years wait period.  *Id.*

18

United States District Court
Northern District of California

Avenues to obtain legal permanent residence vary depending on the category by which one gains admission to the United States. "Admission" is defined by statute, as "the lawful entry of the alien to the United States after inspection and authorization by an immigration officer." INA § 101(a), 8 U.S.C. § 1101(a)(13), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 § 301(a). In general, a citizen of a foreign country who seeks to travel to the United States must first secure a U.S. visa. *Young v. Trump*, 506 F. Supp. 3d 921, 928 (N.D. Cal. 2020). "A visa is a travel document that confers upon its recipient the right to travel to a port of entry and apply for admissions to enter the United States, but it does not guarantee a right of entry." *Id.* These rules result in a double-check admission system, whereby in general an individual must obtain a visa and then present at a U.S. port of entry or border inspection station where they are subject to inspection by an officer for the U.S. Department of Homeland Security to determine their admissibility. Charles Gordon, Stanley Mailman & Stephen Yale-Loehr & Wada, 1 *Immigration Law and Procedure* § 103[2][c][i].

Refugees are not required to present a visa, but they must apply for refugee status, and approval of their application from abroad authorizes Customs and Border Patrol to admit the applicant conditionally as a refugee upon arrival at a port of entry within four months of the date the refugee application was approved.[11] *See Immigration Law and Procedure* § 34.01[1], [5][a][i], 5[c][ii] (explaining that after receiving a referral from the U.S. refugee admissions program, each person seeking entry as a refugee must execute an application on Form 1-590 with the help of a program official); 8 U.S.C. § 1181(c); 8 C.F.R. § 207.4. A spouse of any refugee is generally "entitled to the same admission status as such refugee if accompanying, or following to join, such refugee" and if the spouse is admissible under the INA. 8 U.S.C. § 1157(c)(2)(A). To be eligible for refugee status as a spouse, the spousal relationship must have existed at the time of filing of the spouse's application for "accompanying or following-to-join benefits" and at the time of the

---

[11] Eligibility for refugee status is determined through an interview with a USCIS officer, who examines all evidence and evaluates the applicant's credibility to determine, among other things, whether the applicant meets the definition of a refugee. *See Immigration Law and Procedure*, § 34.01[5][c][ii], [iii]; USCIS Refugee Eligibility Determination, https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees/refugee-eligibility-determination [https://perma.cc/54FA-VFE9].

spouse's subsequent admission to the United States.  8 C.F.R. § 207.7; USCIS Policy Manual, vol. 7, pt. L, ch. 2, § F.1, https://www.uscis.gov/policy-manual/volume-7-part-l-chapter-2 [https://perma.cc/BT6P-PRBL] ("A derivative spouse (RE-2 classification) of a refugee who divorces the principal refugee prior to seeking admission as a refugee to the United States is ineligible for admission as a derivative refugee.").

Upon entry to the United States, refugees are not admitted for legal permanent residence, as family-based immigrants and those admitted through the diversity visa program are, for example.  *See* 8 U.S.C. § 1159(a)(1).  Similarly, asylees need not apply for a visa and, like refugees, they are not immediately eligible for legal permanent residence.  *See* 8 U.S.C. § 1159(b)(2).  Pursuant to § 1159, however, refugees and asylees may subsequently adjust their status to lawful permanent resident.  Subsections (a) and (b) set forth the eligibility requirements that apply to refugee and asylee applications to adjust, respectively.  The text of subsection (b) is set forth at the beginning of this Order.  Subsection (a) reads as follows:

> **(a) Inspection and examination by Department of Homeland Security**
>
> (1) Any alien who has been admitted to the United States under section 1157 of this title—
>
>> (A) whose admission has not been terminated by the Secretary of Homeland Security or the Attorney General pursuant to suc regulations as the Secretary of Homeland Security or the Attorney General may prescribe,
>>
>> (B) who has been physically present in the United States for at least one year, and
>>
>> (C) who has not acquired permanent resident status,
>
> shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of section 1225, 1229a, and 1231 of this title.
>
> (2) Any alien who is found upon inspection and examination by an immigration officer pursuant to paragraph (1) or after a hearing before an immigration judge to be admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of the alien's inspection and examination shall, notwithstanding any numerical limitation specified in this chapter, be regarded as lawfully admitted to the United

United States District Court
Northern District of California

1    States for permanent residence as of the date of such alien's
     arrival into the United States.

2    8 U.S.C. § 1159(a).

3         Unlike asylees who apply for legal permanent residence, refugees are not required to

4    demonstrate that they continue to be a refugee within the meaning of the INA or a spouse or child

5    of such a refugee.  *Compare* 8 U.S.C. § 1159(a)(1) *with* § 1159(b)(3).  A refugee is eligible for

6    adjustment of status if their "admission has not been terminated by the Secretary of Homeland

7    Security or the Attorney General," they have been "physically present in the United States for at

8    least one year," and they have not otherwise acquired permanent resident status.  8 U.S.C.

9    § 1159(a)(1).  Thus, there is no requirement that refugee status continue through to the time that

10   the refugee seeks legal permanent residence.  This means that a derivative spouse who secured

11   admission as a refugee based on a marriage to the principal refugee, need not remain married, and

12   thus a derivative beneficiary with refugee status, to be eligible for legal permanent residence.  The

13   USCIS Policy Manual confirms that divorcees of principal refugees may be granted LPR status.

14   USCIS Policy Manual, vol. 7, pt. L, ch. 5, § F.1, https://www.uscis.gov/policy-manual/volume-7-

15   part-l-chapter-5 [https://perma.cc/Y3AR-GMVE] (addressing the code of admission for an

16   applicant who was admitted as a spouse of a refugee but has since become a "former spouse of the

17   principal at time of adjustment").

18        In subsection (b)(3), the word "continues" draws a distinction that the individual with

19   asylum status, in contrast to the person admitted as a refugee, must continue to meet the definition

20   of a refugee[12] at the time that legal permanent residence is sought.  When a refugee spouse

21   satisfies an eligibility requirement by remaining married merely at the time of the derivative's

22   admission, Defendants' reading that the word "continues" should require spouses of principal

23   asylees to remain married not only through when they apply for LPR status, but also through

24   adjudication, imposes a significant, relative burden on asylee spouses.  This added burden is

25   contrary to the stated purpose of the Refugee Act, which seeks to integrate and resettle refugees

26   and asylees by allowing for adjustment to legal permanent residence after one year of physical

27

28   [12] Asylees must meet the statutory definition of a "refugee" because the INA treats asylees as a
     subset of refugees, as noted above.

United States District Court
Northern District of California

1   presence in the U.S. following the grant of either type of humanitarian relief.  *See* 8 U.S.C.

2   § 1159(a)(1), (b)(2).  Furthermore, for families that consist of married parents and their children

3   who obtained asylum status, under Defendants' reading, if the marriage ends following the

4   application for legal permanent residence, the derivative children would remain eligible for

5   permanent residence, but their derivative parent would lack the stability of that permanent status.

6   This further undercuts the stated purpose of the Act, which is to stabilize and support the

7   resettlement and integration of refugees and asylees.  Although § 1159 establishes some

8   distinctions between the criteria for adjustment of status of asylees as compared to refugees,

9   construing those distinctions narrowly better serves the purposes of the Refugee Act.

10              **b.      Text and Structure of § 1159(b)**

11          Defendants contend that the statute requires marriage through the time of adjudication of

12   the derivative spouse's application for legal permanent residence.  The statute frames this marriage

13   requirement as a condition for the Government to "adjust . . . the status of [an] alien granted

14   asylum."  8 U.S.C. § 1159(b).  Defendants read that language in isolation as indicating that the

15   asylee must continue to be a spouse of a refugee *when the status adjustment is made*.[13]

16          The relevant text of the statute does not end, however, with the specific phrase at issue.  "It

17   is necessary and required that an interpretation of a phrase of uncertain reach is not confined to a

18   single sentence when the text of the whole statute gives instruction as to its meaning."  *Maracich*

19   *v. Spears*, 570 U.S. 48, 65 (2013).  Here, context shows that Defendants' reading is not the only

20   reasonable way to understand § 1159(b), and that Azarmanesh's interpretation better comports

21   with the statute as a whole.

22          As the Western District of Wisconsin noted in *Dorbor*, the use of the present tense rather

23   than past tense for the word "applies" in subsection (b)(1) suggests that the inquiry occurs at the

24

25   _____

26   [13] That reading is consistent with a decision by the Fifth Circuit, which considered the issue only
     in passing in a case holding that a refugee whose asylum status had been terminated could still
     adjust to LPR status, but characterized § 1159(b)(3) as a "continuing-status requirement"
27   distinguishable from the requirement to have been granted asylum.  *Siwe v. Holder*, 742 F.3d 603,
     609 (5th Cir. 2014).  *Siwe* does not include any analysis of § 1159(b)(3), and its reference to that
28   statute is dicta.  This Court does not find *Siwe*'s passing reference to § 1159(b)(3) to be a
     persuasive interpretation.

time an application is submitted. *Dorbor*, 379 F. Supp. 3d at 770 (citing *Carr v. United States*, 560 U.S. 438, 448 (2010), addressing the significance of verb tense in statutory interpretation). If, as Defendants contend, everything following subsection (b)'s introduction of criteria to "adjust" LPR status were evaluated at the time of adjustment, the requirement that an asylee "*applies* for such adjustment"—rather than the past tense "*applied* for such adjustment," or perhaps present perfect "*has applied*"—would be incongruous. Taking Defendants' construction to an extreme, subsection (b)(1)'s use of present tense might suggest that an asylee whose application had previously been pending must somehow apply again at the time of adjustment. Defendants do not dispute that an applicant's previous submission of an application is sufficient to adjust status. In other words, the requirement that an applicant "applies for such adjustment" is evaluated at the time of the application. Listing that condition first further suggests that the subsections following it should also be evaluated when the applicant "applies for such adjustment," except as otherwise specified.

One condition specifies a different timeframe: subsection (b)(5), which requires that an applicant "is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter *at the time of examination* for adjustment of such alien." 8 U.S.C. § 1159(b)(5) (emphasis added). The parties appear to agree that the "time of examination" is functionally equivalent to the time of adjudication. *See, e.g.*, ECF No. 35 at 26 (Defendants' Motion, equating this language with "the time of adjustment").[14] "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (cleaned up). The time-of-examination specification for subsection (b)(5) thus implies that other provisions that are silent as to timeframe, like subsection

---

[14] In *Soumah II*, the Government belatedly raised an argument in its reply brief that the "examination for adjustment" is distinct from "adjustment." 2025 WL 638472, at *5. The court found that argument unpersuasive, even assuming for the sake of argument it had not been waived. *Id.*; *see also Zalmai*, 2025 WL 938619, *6 (holding that "'examination for adjustment' must mean adjudication," because a contrary reading would negate the inadmissibility inquiry in cases where a distinct "examination" does not occur). No such argument has been raised here. If it had been, this Court would find the *Soumah* and *Zalmai* courts' analysis persuasive.

23

United States District Court
Northern District of California

(b)(3), apply at some other time.  *See Dorbor*, 379 F. Supp. 3d at 770.  "[T]his language demonstrates that Congress knew how to require that a criterion be satisfied at the time of adjustment of status, and where such language was not included in § 1159(b)(3), Congress did not intend to require that status as a spouse of a refugee or asylee must continue through the date of adjustment of status."  *Soumah II*, 2025 WL 638472, at *5 (citing *Soumah I*, 738 F. Supp. 3d at 639).

Courts also generally presume that Congress did not intend for statutory language to be superfluous.  *Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022).  If, as Defendants contend, the overarching framing of § 1159(b) as eligibility to "adjust . . . status" implies evaluation at the time of adjudication, then subsection (b)(5)'s specification that at applies at that time would be superfluous.  That remains true regardless of subsection (b)(5)'s reference to the exceptions in subsection (c), which Defendants suggest is the purpose of subsection (b)(5)'s time-of-adjudication language.  *See* ECF No. 38 at 6.  If *all* criteria of § 1159(b) applied at the time of adjudication, then there would be no need for subsection (b)(5)—and only subsection (b)(5)—to specify that inadmissibility, and exceptions thereto under subsection (c), are assessed at that time.

Relative policy considerations support that distinction, because "[t]he reasons why an applicant would become inadmissible are far more grave than if an applicant gets divorced."  *Zalmai*, 2025 WL 938619, at *6.  Reasons for inadmissibility "include criminal conduct, terrorist activities, and affliction with a communicable disease.  8 U.S.C. § 1182.  Unlike an applicant's divorce, these are issues that raise serious concerns about the applicant's suitability for LPR status regardless of when they occur."  *Dorbor*, 379 F. Supp. 3d at 770.  In contrast to the inadmissibly criteria at issue for subsection (b)(5), "none of [the other subsections] carry any potential national security or public safety implications."  *Soumah II*, 2025 WL 638472, at *5.

Defendants argue that Congress might have had reasons to include that language in subsection (b)(5) even if other subsections also applied at the time of adjudication.  They assert that admissibility would not have been evaluated previously because it is not a requirement for asylum, ECF No. 35 at 26, and that this language might be intended to make clear that

1   admissibility (unlike marriage) is not a continuing requirement, such that an applicant who was

2   inadmissible at the time of an application may still be granted adjustment of status if a waiver of

3   inadmissibility is granted while the application is pending, ECF No. 38 at 6.

4        With respect to the former argument, that admissibility is not evaluated in granting asylum,

5   Defendants cite a decision by Judge Chen that does not, on review, support their position.  Judge

6   Chen determined that the Government's previous grant of asylum despite knowledge of the

7   applicant's involvement in a particular group did not collaterally estop the Government from

8   denying adjustment of status based on terrorist activities, because the question of whether that

9   group was a terrorist organization was not "actually litigated" in the context of the asylum

10   application.  *See generally Janjua v. Neufeld*, No. 15-cv-05475-EMC, 2017 WL 2876116 (N.D.

11   Cal. July 6, 2017), *aff'd*, 933 F.3d 1061 (9th Cir. 2019).  But in doing so, Judge Chen held that

12   issue of admissibility was "necessarily decided" in the asylum context (even though it did not

13   meet the separate test for collateral estoppel of having been "actually litigated") because "both

14   8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute

15   governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing

16   inadmissible aliens) to determine whether an alien is eligible for relief."  *Id.* at *2 (quoting

17   *Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013)); *see id.* at *9.  At least some

18   admissibility criteria are evaluated in the context of an asylum application.  *See* 8 U.S.C.

19   § 1158(b)(2).  Even if that were not so, the Government does not explain why any lack of previous

20   consideration of admissibility criteria would guide whether they should be assessed at the time of

21   an application for adjustment or at the time of its adjudication—or more specifically, why that

22   would warrant a special note that admissibility should be assessed at the time of actual adjustment,

23   if that were redundant to the timing of all of the other criteria for adjustment identified in

24   § 1159(b).

25        Defendants' other argument with respect to subsection (b)(5)—that the timing identified

26   therein is intended to account for waivers granted while an application is pending and to

27   distinguish it from "continuing" requirements under the other subsections—conflicts with

28   Defendants' overarching position that *all* of the § 1159(b) criteria should be assessed at the time of

1    adjudication, and specifically with their current policy of assessing subsection (b)(2)'s one-year

2    presence requirement *only* at the time of adjudication.

3         The *Dorbor* decision found further support for a time-of-application reading of subsection

4    (b)(3) in subsection (b)(2), which that court understood as requiring an applicant to have been

5    present in the United States for at least one year at the time of an application.  379 F. Supp. 3d at

6    769–70 (reaching that conclusion based in part on the uncertainty of how long an application will

7    take to resolve).  Azarmanesh raises a similar argument here, asserting that subsection (b)(2)

8    reflects a waiting period before an application can be submitted.  ECF No. 37 at 8.  Defendants

9    note that USCIS understands and applies subsection (b)(2) as requiring at least one year's presence

10   only at the time of adjudication.  ECF No. 35 at 25–26; USCIS Policy Manual, vol. 7, pt. M, ch. 2,

11   § A.  As noted above in the context of ambiguity, however, USCIS's policy manual acknowledges

12   that USCIS's past practice and interpretation of that provision have differed.  USCIS Policy

13   Manual, vol. 7, pt. M, ch. 2, § A n.2.  It is not obvious that subsection (b)(2) provides any clearer

14   indication of a time-of-application or time-of-adjudication approach than subsection (b)(3), and

15   this Court does not follow *Dorbor* in finding that subsection inherently indicative of such a

16   framework.  But neither does it support Defendants' position that these provisions must be

17   evaluated at the time of adjudication.

18        As discussed above, Congress's choice to specify an evaluation "at the time of

19   examination" only for subsection (b)(5) lends credence to Azarmanesh's interpretation that

20   subsection (b)(3) does *not* apply at that time.  And the first item in the adjustment eligibility

21   criteria, that an applicant "applies for such adjustment," indicates that at least some of the criteria

22   apply at the time of application rather than adjudication.  The statutory text is ambiguous, but on

23   balance, tends to support the conclusion that a derivative spouse need only be married to the

24   principal asylee at the time of submitting an application for adjustment.

25                 **c.**     **Circuit Decisions Support the Time-of-Application Approach**

26        Circuit court decisions addressing other immigration provisions pertaining to marriage

27   reinforce the conclusion that § 1159(b)(3) should not be construed restrictively.  In *Choin v.*

28   *Mukasey*, 537 F.3d 1116 (9th Cir. 2008), the Ninth Circuit considered a provision related to "K

United States District Court
Northern District of California

26

visas" for fiancé(e)s of U.S. citizens.  The relevant statute provided:

> The Attorney General may not adjust ... the status of a [K visaholder] except to that of an alien lawfully admitted to the United States on a conditional basis under section 1186a of this title *as a result of the marriage of the nonimmigrant* . . . to the citizen who filed the [K visa petition].

*Id.* at 1119 (quoting 8 U.S.C. § 1255(d)) (alterations in original).  The court held that the statute was ambiguous as to whether an applicant who had married but later divorced her U.S. citizen husband could still adjust status.  Relying on other provisions of law that allowed a divorced spouse to remain in the country so long as the marriage was entered in good faith, even if the marriage did not meet the default durational requirement, the court held as a textual matter that an adjustment could still be considered a "result of the marriage" even if the marriage had ended before the adjustment was adjudicated.  *Id.* at 1120–21 (citing 8 U.S.C. § 1186a(c)(4)(B)).  *Choin* also concluded that excluding all divorced spouses who arrived on K visas from adjustment, even if a marriage was entered in good faith, would not serve the stated purpose of the statute, which was to combat fraud.  *Id.* at 1120.

Here, although the text of provision in dispute differs, the purpose of the Refugee Act is to extend rather than restrict immigration benefits, suggesting that it should be read at least as broadly as the marriage provision at issue in *Choin*.  There, the Ninth Circuit rejected the Government's position that "an immigrant here on a K visa must stay married until the government gets around to adjudicating her application for adjustment of status," and declined "impose [that] durational requirement . . . based only on the ambiguous language in the statute." *Id.* at 1121.  The court noted its previous decision in *Freeman v. Gonzalez.  See id.*  In *Freeman*, the Ninth Circuit held under a different statute that "an alien's status as a qualified spouse should not turn on whether DHS happens to reach a pending application before the citizen spouse happens to die," suggesting through a citation and parenthetical quotation that such an outcome would be "'an absurd and unjust result which Congress could not have intended.'"  *Freeman*, 444 F.3d 1031, 1043 (9th Cir. 2006) (quoting *Clinton v. New York*, 524 U.S. 417, 429 (1998)).  Like *Choin*, the *Freeman* case dealt with a different statute and different textual analysis, but its discussion of the absurdity of conditioning immigration status on how long the Government delays

adjudicating an application applies equally here.

In *Carpio v. Holder*, 592 F.3d 1091 (10th Cir. 2010), another appellate decision on which *Dorbor* relied, the Tenth Circuit considered a statute providing "K-2" visas to minor children of the fiancé(e)s of U.S. citizens. Because the "statute . . . focuse[d] the inquiry on the age of the minor child *when* his parent is engaged and *when* he or she 'seeks to enter the United States' on a K–1 visa," the court held that the minor child's age should be considered at the time of an application, not the time of adjudication. *Id.* at 1099. That language differs from § 1159(b)(3), but the court also held that allowing the Government to effectively deny any minor's application by holding it until the minor aged out of eligibility would be fundamentally unfair. *Id.* at 1102. Again, that principle weighs against construing § 1159(b)(3) such that the Government's delay in adjudicating Azarmanesh's application for adjustment of status should have resulted in its denial, when there is no dispute that Azarmanesh would have been entitled to adjustment had the Government considered his application more quickly.

This is not to say that immigration statutes have never or should never be interpreted as adopting a time-of-adjudication test. The Court is aware of at least one decision from the Ninth Circuit so holding. In *Mendez-Garcia v. Lynch*, a case cited by Defendants, the Ninth Circuit considered a test for cancellation of removal under 8 U.S.C. § 1229(b)(1)(B) that looked to whether removal would result in hardship to the petitioner's "child" who is a citizen or LPR, and held that the child must be under the age of twenty-one at the time the petition is decided. 840 F.3d 655, 663 (9th Cir. 2016). To reach that conclusion, however, the Ninth Circuit deferred to an interpretation of the statute by the Board of Immigration Appeals under the *Chevron* doctrine, which is no longer good law. *Id.* The Court therefore finds *Mendez-Garcia* to be of limited persuasive value in evaluating a different statute in the post-*Chevron* era. *See also Soumah II*, 2025 WL 638472, at *7 (holding that a time-of-adjudication approach to § 1229(b)(1)(B) "flows from the specific language of the relevant statutory provision, which states that a petitioner must show that the 'removal' would result in such hardship").

Instead, this Court agrees with the consensus of other district courts that have addressed § 1159(b)(3) in this context, that "the same concerns about fairness that applied in *Choin* and

1   *Carpio* apply in this case as well," when "[t]he government hasn't identified any legitimate

2   government interest that is served by construing § 1159(b)(3) to render an application invalid

3   simply because the applicant's marital status changes after filing." *Dorbor*, 379 F. Supp. 3d at

4   771; *see also Soumah II*, 2025 WL 638472, at *8 (noting "the absurd result that eligible applicants

5   receive disparate results based on the timing of when USCIS chooses to adjudicate their

6   applications," and that "USCIS's interpretation disincentivizes prompt adjudications and penalizes

7   applicants for delays entirely within the Government's control"); *Soumah I*, 738 F. Supp. 3d at

8   639–41; *Zalmai*, 2025 WL 938619, at *8 ("If the only reason Ms. Zalmai's application was denied

9   was because USCIS did not adjudicate her application soon enough, that is an arbitrary and

10  capricious result.").

11      These concerns are exacerbated when Defendants have failed to identify any statute,

12  regulation, instruction, or other guidance requiring an applicant for adjustment of status to notify

13  USCIS if the applicant's marital status changes while the application remains pending.  After the

14  Court requested a supplemental brief on that issue, Defendants took the position that the oath

15  required for the Form I-485 application to adjust status—indicating that the applicant has provided

16  true and correct information—*implicitly* includes "the obligation to update USCIS of any

17  changes."  ECF No. 42 at 3.  But that oath is required only *at the time of the application*, and says

18  nothing about proactively updating USCIS if the applicant gets divorced.  *See* ECF No. 42-2 at 49.

19  Certifying that the applicant provided true information and "ha[s] not withheld information" when

20  an application is submitted is a far cry from committing to provide updated information

21  proactively in the future, much less the specific information at issue here.

22      Defendants suggest that interpreting § 1159(b)'s *other* requirements as applying only at the

23  time of an application would lead to absurd results, like requiring adjustment to LPR status for

24  applicants who had resettled in a foreign country after filing their applications.  As the *Soumah*

25  court noted, "the Government . . . can avoid any adverse impacts by adjudicating applications in a

26  timely manner," and the Government has also taken the position that "it maintains discretion over

27  whether to actually grant adjustment of status to an eligible applicant" such that it could avoid

28  absurd results simply by exercising that discretion.  *Soumah II*, 2025 WL 638472, at *7–8.  In any

United States District Court
Northern District of California

event, such concerns are only an issue if the other requirements are *also* assessed only at the time of application, an issue this Court need not resolve in the present case. There is certainly a textual argument for consistency among those requirements, but when subsection (b)(1)'s requirement that an application "applies for such adjustment" plainly looks to the time of application, the options are either that all such requirements apply at that time (except subsection (b)(5), which explicitly sets a different time), or that some apply at one time and others apply at others. Neither supports Defendants' position.

### d.    8 C.F.R. § 103.2(b)(1) Does Not Favor a Different Result

Defendants briefly invoke a regulation requiring generally that an "applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication." 8 C.F.R. § 103.2(b)(1); *see* ECF No. 35 at 24. That regulation does not appear to mean anything more than that applicants must meet any eligibility requirements *that apply at the time of submission* when they apply, and must continue to meet any eligibility requirements *that apply at the time of adjudication* when their applications are decided. *See Zalmai*, 2025 WL 938619, at *9; *Soumah I*, 738 F. Supp. 3d at 642.

If the regulation required *all* conditions to be met at both submission and adjudication, that would contradict statutory provisions conditioning certain criteria to a specific time. *E.g.*, 8 U.S.C. § 1159(b)(3) (requiring an applicant for adjustment to be admissible "at the time of examination"). It would also contradict USCIS's practice of interpreting § 1159(b)(2) as requiring one year of presence in the United States only at the time of adjudication, not at the time of admission, *see* ECF No. 35 at 25–26, and binding circuit precedent interpreting other requirements to apply *either* at the time of application *or* at the time of adjudication. *E.g.*, *Choin*, 537 F.3d 1116. As other courts have noted, "a 'valid statute always prevails over a conflicting regulation,'" such that 8 C.F.R. § 103.2(b)(1) cannot alter the meaning of 8 U.S.C. § 1159(b)(2). *Soumah II*, 2025 WL 638472, at *8 (quoting *Texas v. Env't Prot. Agency*, 726 F.3d 180, 195 (D.C. Cir. 2013)); *Zalmai*, 2025 WL 938619, at *9.

This regulation does not alter the Court's conclusion that the statute required continued marriage to a principal asylee only at the time of Azarmanesh's application to adjust status, not at

United States District Court
Northern District of California

1    the later date that USCIS adjudicated it.

2    **V.    CONCLUSION**

3         For the reasons discussed above, Azarmanesh's first application for adjustment to LPR

4    status was lawfully granted, because Azarmanesh was married to a refugee (specifically, an

5    asylee) at the time he submitted that application, and he was not required to remain married when

6    USCIS later adjudicated it.  Azarmanesh was therefore eligible for naturalization when he applied

7    for citizenship in 2021 and when Defendants wrongfully denied that application in 2022.

8    Accordingly, Defendants' Motion for Summary Judgment is DENIED, and Azarmanesh's Motion

9    for Summary Judgment is GRANTED.

10        Azarmanesh seeks, among other relief, "a hearing *de novo* on [his] naturalization

11   application," approval of that application, and administration of the oath of naturalization.  FAC at

12   10 (Prayer for Relief).  Defendants agree with Azarmanesh that the material facts are not in

13   dispute and assert that no evidentiary hearing is needed.  ECF No. 35 at 10 n.4.  It follows that

14   Defendants concede Azarmanesh's eligibility for citizenship but for the disputed issue of law

15   regarding his original LPR status, as addressed in the parties' briefs.  Defendants have not

16   disputed that a court order approving a naturalization application and directing the administration

17   of the oath of naturalization to an applicant are remedies available pursuant to 8 U.S.C. § 1421(c).

18   Reviewing Azarmanesh's naturalization application de novo pursuant to 8 U.S.C. § 1421(c), the

19   Court finds and concludes that Azarmanesh is eligible for naturalization, and GRANTS the

20   application. *See Soumah II*, 2025 WL 638472, at *9 (granting a naturalization application "where

21   the only basis for denying Soumah's application for naturalization was the determination that he

22   had not met [the lawfully granted LPR status] requirement, the parties have stipulated that Soumah

23   met all other enumerated requirements for naturalization, and the parties waived a hearing on

24   Soumah's naturalization application").

25        Defendants are ORDERED to naturalize Azarmanesh no later than May 15, 2025.  If

26   Defendants are unable to satisfy this deadline, the parties may request assistance from the Court

27   pursuant to the authorities granted in 8 U.S.C. §§ 1421 and 1448(c).

28   / / /

United States District Court
Northern District of California

The Clerk is directed to enter judgment in favor of Azarmanesh and close the case.

**IT IS SO ORDERED.**

Dated: March 31, 2025

_____
LISA J. CISNEROS
United States Magistrate Judge